## Case No. 15,467.

### UNITED STATES v. The JAMES WELLS.

[Brunner. Col. Cas. 65; [1] 3 Day. 296.]

Circuit Court, D. Connecticut. Sept., 1808. [2]

EMBARGO ACT — CONDEMNATION — NECESSITIES OF NAVIGATION.

The homeward bound cargo of a vessel having proceeded to a foreign port in contravention of the act of congress of the 9th of January. 1808 [2 Stat. 453], supplementary to the general embargo act, is not liable to condemnation. On a libel against the vessel for having thus proceeded, necessity arising from stress of weather and the condition of the vessel is no defense.

Appeal from the district court of the United States for the district of Connecticut.

This was a libel founded on an alleged violation of the act of congress approved the 9th of January, 1808, supplementary to the general act laying an embargo on all ships and vessels in the ports and harbors of the United States. The brig of which Stephen Griffiths was claimant was charged with proceeding to a foreign port or place, contrary to the provisions of said acts, and was condemned by the decree of the district court. [Case unreported.] The cargo, of which the claimants were. Jesse Hurd of eighty puncheons of rum. N. G. Rutgers and B. Seaman of three hundred and twenty-six bags of coffee, and J. H. Rawlins & Co. of forty-seven hogsheads and fourteen barrels of sugar, and five hogsheads of rum, was restored. On the opening the cause it appeared that the cargo libelled was the return cargo of the vessel from the West Indies.

Mr. Daggett, for the claimants contended

that the embargo law did not authorize a condemnation of this property. Though the vessel went out in violation of the embargo, the claimants are entitled to a restoration of the return cargo.

Mr. Wolcott, contra.

LIVINGSTON, Circuit Justice.—I have a strong impression that the provisions of the act apply only to the cargo carried out. In a case like this, nothing is to be taken against the claimants by implication. The most express words would be necessary to include the homeward-bound cargo. But congress have said nothing about it. We cannot supply any omission. The intention of the act was to prevent exportation. I am ready to say that those parts of the decree restoring the cargo ought to be affirmed. Proceed to the vessel.

The cause was conducted by the district attorney and Wolcott, on the part of the United States; and by Daggett and Bristol, for the claimants. The evidence, so far as it is material to the present purpose, is recapitulated in the opinion of the court.

LIVINGSTON, Circuit Justice.—This is a libel against the brig James Wells, for proceeding to a foreign port in contravention of an act of congress. Admitting the fact, the claimant interposes a plea of necessity, and contends that although he may have violated the letter, he is not within the spirit and meaning of the law. Whether such matter can form a good defense here. is a question of considerable magnitude. To interpret a statute by its equity, or to say cases are without its spirit, although within its express letter. is at all times a delicate and difficult office. It is making, instead of expounding, laws. It often sets in array against the rigorous provisions of an act, the feelings of a single judge who may not always have firmness enough to enforce them, if he be at liberty to mitigate their severity when they may be supposed to bear hard upon a particular case. He, besides, destroys that certainty in laws which is a property so much desired, and must ever constitute one of their chief excellences. Even when this mode of interpretation may be indulged, it should be strictly confined to cases which could not, from their nature or the infrequency of them, be supposed to have been foreseen by the legislature. But when the necessity or vis major which is relied on, arises from circumstances which were too obvious to have escaped the most ordinary capacity, but which, notwithstanding, are not found to form an exception from the general provisions of the law, a court may perhaps say, "Per quam durum, sit ita lex scripta est." When to this is added that another tribunal is erected and referred to by these very laws, invested with full power to relieve in cases of accident. etc., unintentional and innocent infractions, it can hardly be doubted but that the courts of the United

---

[3] [Reported by Hon. William Cranch. Chief Judge.]

[1] [Reported by Albert Brunner. Esq., and here reprinted by permission.]

[2] [Affirmed in 7 Cranch (11 U. S.) 22.]

States are designedly excluded in all cases of this nature from every equity of interpretation whatever, and that for a mitigation of their rigor recourse must be had elsewhere. Without, however, deciding how far a defense of this nature be admissible, where the act is silent as to any exception, the court will proceed to examine whether in point of fact the claim is supported. A more unpleasant office cannot devolve on a judge than to be called on to determine both the law and the fact, in a penal suit between the government and a fellow citizen. But whatever his feelings as an individual may be, and of these I should never wish to divest myself, he must not lose sight of those solemn sanctions he is under, to administer with strict impartiality the laws of his country. In these every man has an interest, and to permit those who violate them to pass with impunity is an injury to such who, from principle or from any other motive, make them the rule of their conduct.

The fact alleged in the libel being admitted, it will not be denied that the necessity on which the claim is founded should be made out in a manner to leave no reasonable doubt that it produced the violation complained of. The onus lying on the claimant, his proof should be strong and satisfactory. If anything short of this be admitted, laws, however salutary, may be easily transgressed and their penalties avoided.

This vessel sailed from New York on the 26th of February of the present year, bound on a voyage to St. Mary's, in Georgia. She was new, and without encountering any extraordinary bad weather, or meeting with any accident, we find her in a very few days bearing away for the West Indies. For this conduct no other reason is assigned but her leaky condition. Of this fact there is probably not much doubt; but that the danger arising from this circumstance was so imminent as to justify the act, is not so clearly established. It is true, that those on board must, prima facie, be the best judges of the necessity, which may exist for changing the course of a voyage; and where no circumstances arise to impeach their testimony, they will be entitled to and receive full credit. But where every one of the parties may possibly be implicated in heavy penalties, it cannot be regarded as a want of charity to listen to their allegations with some caution. The master, it is concluded, is in this predicament, and it may well be doubted whether all the other hands are not subject to the same penalties. If so a very strong inducement existed in them all to give a high coloring to the transaction. But without detracting from their credit on account of their participation in it, and their possible liability, it is not easy to believe that on account of the leak which they describe, a real necessity intervened for leaving the continent. Vessels in a more leaky condition than this one is described to have been in, have sometimes traversed the ocean, encountered considerable storms, and arrived in safety. There is too much reason, therefore, to think that unless some strong temptation to depart from the track of the original voyage had presented itself, more serious and successful efforts would have been made to reach St. Mary's. This surmise is much strengthened by the voyages performed by other vessels at the same season of the year, and on parts of the ocean not very distant from this brig. Neither has it escaped the attention of the court, that after bearing away, the winds and weather for a long time were very favorable to have made an attempt to reach the destined port; for whatever necessity may have produced at the time a determination to go to the West Indies, if a reasonable prospect, such as moderate weather and favorable winds shortly after, presented, of reaching the continent in safety, it ought to have been embraced; and if the cargo were found to be greater than the vessel could bear, there can be no hesitation in saying that part of it ought to have been sacrificed, if not the whole, in preference to landing it in a foreign country in direct violation of a public law, which could have been done without forfeiting the penalty of the bond which had been given to land it in the United States. This is an argument which was not urged by the counsel for the United States, but has considerable influence with me in the judgment I am about to give. It is not pretended that this vessel, if relieved of part or the whole of her cargo, might not have returned to the United States. The underwriters, if insurance had been made to St. Mary's, would have been liable; and if uninsured, the owner should have borne the loss himself rather than have gone to a foreign port. If this view of the subject be correct, there is an end of every justification arising from necessity. The carrying of the cargo to St. Bartholomews then becomes a voluntary act, which nothing could justify, but being driven there by a sudden and severe tempest, which did not leave time or opportunity to throw it into the sea.

But if this were not a duty, there are other circumstances which render it difficult to believe that this was not a concerted plan to evade the embargo laws. There is no evidence to show what was the value of flour at St. Mary's. It is a fair inference, therefore, that the cargo was chosen for a West Indian market, where the embargo would necessarily produce a scarcity of that article. We also find the owner on board as supercargo, which is not very usual in coasting voyages. He carried with him, also, notes payable in the West Indies; and although those may have been duplicates, it is not very customary, whatever may be the practice on land, to take such papers to sea. Nor is it very conclusively made out that there was a necessity to dispose of the cargo at Gustavia; and although the sale at that port constitutes

no part of the present offense, it is some evidence of the quo animo; for if repairs had been the only object of going there, the cargo would have been retained and brought back unless prevented by some compulsion or force on the part of government. It is also impossible to evade the very forcible circumstance of the holes which were bored in this vessel. On this subject, as well as on every other, the court has listened with great pleasure to the very ingenious remarks of the claimants' counsel; and although it felt desirous that the impressions which were unavoidably made, when this occurrence and some others were first mentioned, should be removed, it cannot say that the manner in which they have been accounted for has had that effect.

The secrecy with which these holes were made, the place chosen for the purpose, the instrument made use of, the manner in which they were closed, the mode of fastening the plugs, with the anxiety discovered to prevent a discovery previous to the first trial, and the chance by which the disclosure was at last made, render it very difficult to believe that their design was such as is now pretended, or any other than to produce a leak, which was to furnish the means of defense against a prosecution which it was foreseen would take place on the return of the vessel to the United States. I take no notice of the erasures in the log-book, because it is possible they may have been made bona fide; and it appears from the witnesses that from the winds which prevailed the vessel might very well have been where she was, when it was determined to bear away. But taking all the testimony and circumstances together, I am compelled with every inclination to come to a different result, to believe that the claimant has altogether failed in showing such a necessity as would, under an express exception in the statute, have justified him in going to a foreign port. The judgment of the court, therefore, is that the decree of the district court condemning the brig James Wells be affirmed.

[The case was taken on an appeal to the supreme court, where the decree of this court was affirmed. 7 Cranch (11 U. S.) 22.]